IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

LEROY HUFF, JR.,                          *

    Plaintiff,                          *

vs.                                       *

                                   CASE NO. 3:08-CV-52 (CDL)

POWER PARTNERS, INC.,                     *

    Defendant.                          *

## O R D E R

Plaintiff is a former employee of Defendant.  He contends that Defendant terminated his employment because of his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").[1]  Presently pending before the Court is Defendant's Motion for Summary Judgment (Doc. 29).  For the reasons set forth below, the motion is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In determining whether a *genuine* issue of *material* fact

---

[1]Plaintiff also bases his claims on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  (Compl. at 3 ¶ 3, 4 ¶ 6.)  Plaintiff only contends that age was the basis for the alleged discrimination.  Age is not a protected class under Title VII. 42 U.S.C. § 2000e-2(a) (providing that it is an unlawful employment practice to discriminate against an employee because of his race, color, religion, sex, or national origin).  Therefore, to the extent Plaintiff attempts to assert an age discrimination claim under Title VII, that claim is dismissed.

exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed for purposes of the presently pending motion.[2]

## I.   Defendant's Business and Plaintiff's Work History

Defendant manufactures pole-mounted distribution transformers that help bring electric power to homes and businesses.  As part of its manufacturing process, quality specialist employees in Defendant's quality department inspect parts as they come into Defendant's facility so that they can identify potential defects before the parts are integrated into the finished products.  This inspection is called receiving inspection.  Quality specialists also inspect products before they are shipped to Defendant's customers.

---

[2]Plaintiff, who is proceeding *pro se*, did not respond to Defendant's statement of material facts as required by the Court's local rules. Nonetheless, the Court is satisfied based on Plaintiff's response to Defendant's motion that Plaintiff understood his basic obligation to respond to Defendant's summary judgment motion and point the Court to evidence he contends contradicts the material facts asserted by Defendant.

Both types of inspection are important; if the inspections are not accurate, Defendant's products may not meet customer expectations, or, worse, the products may create a safety hazard.

Plaintiff began working at Defendant's facility as an assemblyman in 1970. At the time, the facility was owned by an entity other than Defendant; Defendant purchased the facility in 2004. Plaintiff became a quality specialist in 2000, and he inspected completed units as they came off the production line. He moved to a receiving inspection position in 2002, and he was the only quality specialist specifically assigned to this role. Dalerie Cleveland, a woman under the age of 40, was also a quality specialist. Cleveland was not assigned to a particular function and floated to different areas as needed. She had been trained on the receiving inspection job and regularly filled in for Plaintiff performing the receiving inspection job. Harry Gabriel, an engineering technician, occasionally helped with the receiving inspection job.

## II.  Defendant's Process Changes

In 2004 and 2005, Defendant's owners and executives began discussing ways to increase the efficiency and quality of Defendant's products and processes. Defendant decided that one way it could improve was to expand the role of the quality department so that quality specialists would not only inspect parts and products but would also audit the processes by which Defendant's products were

3

produced.  The goal of this change was to enable quality specialists to identify problems during the manufacturing process and to formulate solutions to those problems.  Defendant also believed it could control costs and improve efficiency by changing the way parts were initially inspected during the receiving inspection.  With these goals in mind, Defendant promoted David Cook to the role of quality manager in mid-2005.  Cook's task was to oversee the expansion of the quality department's role.  As quality manager, Cook was Plaintiff's supervisor.

Cook introduced several changes to the quality department. First, Cook determined that all quality specialists should be able to perform each role in the quality department, so he required them to cross train with other quality specialists so they could learn the other jobs.  Second, Cook discontinued the old receiving inspection method, called the skip lot method, in favor of a new method, called the representative sample inspection method.  Third, Cook required that quality specialists take additional inspection measurements. Finally, Cook required that quality specialists record inspection data in a computerized database system.  According to Defendant, Plaintiff was reluctant to accept these changes and was unable to perform his job after the changes were implemented.

A.   Cross Training

All quality specialists were required to complete cross training to learn other jobs in the quality department, but Plaintiff did not initially get the required training.  (Pl.'s Dep. 62:3-25, Jan. 14,

4

2009.)   According to Plaintiff, the cross training requirement set Plaintiff up for failure because Plaintiff found it impossible to cross train and keep up with his regular work load.[3]   (Pl.'s Resp. to Def.'s Mot. for Summ. J. 2 [hereinafter Pl.'s Resp.].)   However, the undisputed evidence shows that all employees—including Plaintiff and Cleveland—were expected to cross train on other quality department jobs and keep up with their regular assignments.   (Pl.'s Dep. 59:11-14; Ex. A to Def.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. J., Freeman Aff. ¶ 21, May 15, 2009 [hereinafter Freeman Aff.].)   When they found that Plaintiff had not completed the required cross training, Cook, along with Plaintiff's union representative and Bart Freeman, Defendant's vice president of human resources, met with Plaintiff and told him that he must obtain the training immediately or face disciplinary action.   (Freeman Aff. ¶ 21.)   A letter documenting this meeting was placed in Plaintiff's file.   (Ex. C to Freeman Aff., Letter to File, Jan. 26, 2006.)

Despite Plaintiff's initial failure to complete the required cross training, Plaintiff contends that Defendant discriminated against him by not providing him with other training.   Defendant's changes to the quality department were based on concepts from the Six

---

[3]Plaintiff sought assistance with his job duties from Gabriel and Cleveland.  (*E.g.,* Pl.'s Dep. 94:16-19; Freeman Aff. ¶ 23.)  He contends that Cook did not allow anyone to help him on the receiving inspection job but that Cook allowed Gabriel to help Cleveland when she filled in for Plaintiff. (Pl.'s Resp. 7; Pl.'s Dep. 94:22-95:9, 211:19-23.)  At the time, however, Cleveland was not assigned to the receiving inspection role full time, and she was subbing for Plaintiff when she received the help.

Sigma business management strategy.  Plaintiff asserts that he was not given Six Sigma training and that Cleveland was.  (Pl.'s Resp. 2.)   However, Plaintiff points to no evidence that this concept training was required for him to do his job or that his performance suffered because he did not receive the Six Sigma training.

B.    Parts Inspection Method

In the receiving inspection role, Plaintiff was required to inspect parts as they came into Defendant's facility and make a record of the inspection results.  To inspect a part, quality specialists were required to measure the part and compare those measurements to the specifications for that part.  Prior to 2005, Defendant's quality department used an inspection method called the skip lot method.  Under the skip lot method, one sample from a product lot was inspected, and if that sample was free of defects, then the next four lots did not need to be inspected.  According to Defendant, this method resulted in inspectors missing defects, so Defendant decided that the inspection method needed to be changed. Under the new system, called representative sampling, the quality specialists performing the receiving inspection role were required to inspect a sample part from each lot and were no longer permitted to skip lots.

Plaintiff complained to Cook and Freeman that the new inspection method created too much work and that he did not have time to follow the method.   (Pl.'s Dep. 85:5-15; Freeman Aff. ¶ 16.)   Freeman suggested that Plaintiff meet regularly with Cook to prioritize his

daily work load.  (Pl.'s Dep. 70:11-71:10.)  Nonetheless, based on Plaintiff's written inspection records, which indicated that Plaintiff was using the skip lot method, Cook believed that Plaintiff was continuing to use the old skip lot inspection method instead of the new representative sampling method.  (*Id.* at 119:20-121:11; Freeman Aff. ¶ 22; Ex. D to Freeman Aff., Letter to File, Feb. 17, 2006.)   Therefore, Cook believed that Plaintiff was deliberately not following instructions to use the new inspection method.  (Pl.'s Dep. 121:5-11.)  Cook and a representative from Plaintiff's union met with Plaintiff to discuss this issue, and Plaintiff received a three-day suspension for failing to follow instructions.  (*Id.* at 121:5-14; Ex. D to Freeman Aff.)

        C.    Additional Inspection Measurements

        In addition to the other process changes, Defendant began requiring additional measurements during receiving inspection.  Cook found that Plaintiff was using improper measurement techniques and that Plaintiff was unable to measure certain parts accurately. (Pl.'s Dep. 146:9-24, 148:2-15; Freeman Aff. ¶ 23; Ex. E to Freeman Aff., Letter from Cook, Apr. 7, 2006.)  Plaintiff admitted that Cook did not believe Plaintiff knew how to take accurate measurements. (Pl.'s Dep. 163:4-162:2.)   Though Plaintiff was offered additional training to help him improve his measurement techniques, he still had trouble with the measurements.  (*Id.* at 163:10-164:8; Freeman Aff. ¶¶ 23, 24, 29; Ex. E to Freeman Aff.; Ex. F to Freeman Aff., Letter from

Cook, Apr. 12, 2006; Ex. G to Freeman Aff., Email Chain between Cook and Plaintiff; Ex. H to Freeman Aff., Letter to File, undated.)

D.    Database Recording

Another change Cook made to the quality department's procedures was the introduction of a receiving inspection database system.  The purpose of the database was to track and record inspection data, and the database was designed to replace the previous manual recording system.  Everyone who performed the receiving inspection role was required to use the database.  (Pl.'s Dep. 123:10-124:23.)  Plaintiff complained that he did not want to use the database, and without Cook's permission, he stopped entering data into the database.  (*Id.* at 132:24-134:5; Freeman Aff. ¶ 17; Ex. B to Freeman Aff., Letter from Cook, undated.)   Plaintiff contends that the database malfunctioned, that he had to enter the data into the database manually, and that he ultimately made the decision to stop entering the data into the database because of database malfunctions.  (Pl.'s Resp. 3.)   Though Plaintiff claimed he kept written records of the data he had not entered into the database, Cook inspected the records and found them to be incomplete.  (Freeman Aff. ¶ 32; Ex. K to Freeman Aff., Letter, June 21, 2006.)

**III. Plaintiff's Performance Plan and Termination**

All decisions to discipline or counsel Plaintiff were made by Freeman and Cook, along with Mike Stonecipher, Defendant's vice president of technical services. (Freeman Aff. ¶ 20.) Freeman and Cook met with Plaintiff and his union representatives on several occasions to discuss Plaintiff's performance issues and ways Plaintiff could improve. (Pl.'s Dep. 99:16-100:2; Freeman Aff. ¶ 19.) Several times, Cook told Plaintiff that he wanted to help Plaintiff improve and succeed. (Pl.'s Dep. 176:10-12.) On April 12, 2006, Defendant placed a letter in Plaintiff's file detailing Plaintiff's performance issues with regard to Cook's new policies. (Freeman Aff. ¶ 24; Ex. F to Freeman Aff.) On April 18, 2006, Freeman and Cook met with Plaintiff and his union representative to advise Plaintiff that he was being placed on a 30-day performance improvement plan. (Freeman Aff. ¶ 25.) As Plaintiff explained it, Cook did not think Plaintiff was doing the job to Cook's standards, and Defendant gave him thirty days to meet Cook's standards. (Pl.'s Dep. 100:5-11.)

On May 31, 2006, Stonecipher-who was Cook's supervisor-spent several hours observing Plaintiff as he performed his job. (Ex. B to Def.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. J., Stonecipher Aff. ¶ 20, Aug. 27, 2009 [hereinafter Stonecipher Aff.]; Ex. 1 to Stonecipher Aff., Email from Stonecipher to Freeman, June 1, 2006.) Stonecipher concluded that Plaintiff understood his

position as it was performed in the past but that he had significant
weaknesses with regard to the new skills and duties being implemented
to improve the quality department.  (Stonecipher Aff. ¶ 20; Ex. 1 to
Stonecipher Aff.)  Based on these observations, Stonecipher, Freeman,
and Cook concluded that Plaintiff could no longer be successful as a
quality specialist, and Stonecipher recommended that Plaintiff pursue
another opportunity within the company.  (Stonecipher Aff. ¶¶ 20, 22;
Freeman Aff. ¶ 27.)   With the agreement of Plaintiff's union
representatives, Defendant offered Plaintiff other positions within
the plant.  (Freeman Aff. ¶ 28.)  Plaintiff, however, believed that
he was able to perform his job duties satisfactorily, and he refused
to transfer to another position, in part because he believed the
transfer would require a pay cut and in part because he did not
believe he had done anything wrong.   (Pl.'s Dep. 220:21-221:3;
Freeman Aff. ¶ 31.)   After Plaintiff refused to accept another
position in the company, Defendant terminated Plaintiff's employment
on June 21, 2006, citing Plaintiff's poor performance as the reason
for the termination.  (Freeman Aff. ¶ 33.)   At the time of his
termination, Plaintiff was 56 years old.

     No manager or supervisor ever told Plaintiff he was disciplined
or terminated because of his age.   (Pl.'s Dep. 218:1-220:19.)
Plaintiff asserts, however, that Defendant discontinued most of
Cook's changes to the quality department after Plaintiff's
termination, and he appears to suggest that Cook's changes to the
quality department may have been part of an elaborate scheme to

10

terminate Plaintiff because of his age. (Pl.'s Resp. 6.)  However, this theory is implausible because the changes applied to every employee in the quality department; when Cook took over the quality manager position, four of the six quality specialists were 55 years old or older.  Other than Plaintiff, each of those four quality specialists is still employed by Defendant or has voluntarily retired.  (Freeman Aff. ¶ 39.)  Moreover, Plaintiff also suggests that the reason for the subsequent changes is that Cook's system "was not working and had to change." (Pl.'s Resp. 6.)  In addition, sometime after Plaintiff's termination, Cook left the company.

## DISCUSSION

To establish disparate treatment under the ADEA, Plaintiff must prove that age was the "but-for" cause of his termination. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009).[4] Where, as here, there is no direct evidence of discrimination, the Court uses the burden shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[5] *Chapman v. AI Transp.*, 229 F.3d

---

[4]Unlike Title VII, the ADEA does not authorize a mixed-motives age discrimination claim, so Plaintiff cannot prevail by simply showing that age was a motivating factor in the decision to terminate him; he must show that he was terminated *because of* his age. *Gross*, 129 S. Ct. at 2350.

[5]In *Gross*, the Supreme Court noted that it "has not definitively decided whether" the *McDonnell Douglas* evidentiary framework is appropriate in the ADEA context.  *Gross*, 129 S. Ct. at 2349 n.2. Nonetheless, after *Gross*, the Eleventh Circuit continues to apply the burden shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Guimaraes v. NORS*, No. 09-12569, 2010 WL 529296, at *3 (11th Cir. Feb. 16, 2010) (per curiam).  The *McDonnell Douglas*

1012, 1024 (11th Cir. 2000) (en banc).  Under the *McDonnell Douglas*
framework, Plaintiff must establish a prima facie case of
discrimination.  *Id.* at 1024.  The burden then shifts to Defendant to
articulate legitimate nondiscriminatory reasons for the challenged
employment action.  *Id.*  Finally, the burden returns to Plaintiff to
prove that the articulated reasons are pretext for discrimination.
*Id.*  To overcome Defendant's motion for summary judgment, Plaintiff
must proffer sufficient evidence to create a genuine issue of
material fact that each of Defendant's proffered reasons is
pretextual.  *Id.* at 1024-25.

Plaintiff can establish a prima facie case for an ADEA violation
by showing that "he (1) was a member of the protected age group, (2)
was subjected to adverse employment action, (3) was qualified to do
the job, and (4) was replaced by or otherwise lost a position to a
younger individual." *Id.* at 1024.  Here, Defendant does not dispute
that Plaintiff was a member of a protected age group, that he
suffered an adverse employment action, or that he was replaced by a
younger person.  Defendant does contend that Plaintiff was not
qualified for the quality specialist job.  This question overlaps
with the question whether Defendant's proffered reason for
Plaintiff's termination, poor performance, is pretext for

---

framework applies equally to claims under Title VII, the ADEA, and
42 U.S.C. § 1981 ("§ 1981"), so case law interpreting the *McDonnell
Douglas* analysis in the Title VII and § 1981 contexts is also useful in
the ADEA context.  *See, e.g., Armbrester v. Talladega City Bd. of Educ.*,
325 F. App'x 877, 879 n.4 (11th Cir. 2009) (per curiam).

discrimination, and the Court assumes for purposes of the pending summary judgment motion that Plaintiff has established a prima facie case of discrimination.  The Court now turns to the question whether Plaintiff has pointed to sufficient evidence to establish pretext.

To raise a genuine issue of material fact concerning pretext, a plaintiff must cast "sufficient doubt on the defendant's proffered [nondiscriminatory] reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct but were pretext for [discrimination]." *Corbitt v. Home Depot. U.S.A., Inc.*, 589 F.3d 1136, 1162 (11th Cir. 2009).  A plaintiff can withstand a summary judgment motion "by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable."  *Id.* (internal quotation marks omitted). Therefore, the Court "must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Id.* (internal quotation marks omitted).

The pretext inquiry "'centers upon the employer's beliefs, and not the employee's own perceptions of his performance.'" *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per

13

curiam)).  Therefore, if an employer produces performance reviews and
other documentary evidence of poor performance, "an employee's
assertions of his own good performance are insufficient to defeat
summary judgment, in the absence of other evidence."  *Holifield*, 115
F.3d at 1565.  "A plaintiff is not allowed to recast an employer's
proffered nondiscriminatory reasons or substitute his business
judgment for that of the employer."  *Chapman*, 229 F.3d at 1030.
Thus, as long as the proffered reason is one that might motivate a
reasonable employer, the employee "must meet that reason head on and
rebut it, and the employee cannot succeed by simply quarreling with
the wisdom of that reason."  *Id.*

     Here, Defendant asserts that it terminated Plaintiff because his
performance was poor.  It is undisputed that Cook, Freeman, and
Stonecipher believed that Plaintiff was not following the correct
inspection method, was not measuring parts correctly, and was not
recording his inspection data properly.  It is also undisputed that
though Cook, Freeman, and Stonecipher gave Plaintiff chances to
improve, they found that Plaintiff's work did not get better.
Plaintiff contends that Cook, motivated by Plaintiff's age, papered
his file with exaggerated statements to make the case for Plaintiff's
termination.  This assertion is unsubstantiated.  As discussed above,
the undisputed evidence establishes that Cook believed that Plaintiff
was performing poorly each time he criticized Plaintiff's work, and
there is no evidence that a younger employee, such as Cleveland,

14

committed similar errors but was not disciplined.  The evidence also establishes that Stonecipher and Freeman—who Plaintiff does not contend harbored any discriminatory animus toward him—concurred with Cook's assessments.  From this, the Court concludes that Plaintiff has not met his burden of demonstrating pretext.

Plaintiff does suggest a reason other than age for his termination: he points to evidence that Cook was not a good manager and posits that as a result of Cook's "incompetence" as a manager, Cook "caused a negative environment for all employees that worked under his supervision."  (*E.g.,* Pl.'s Resp. 1.)  Plaintiff implies that the rift between Plaintiff and Cook was the reason for his termination; Plaintiff believes that Defendant terminated him rather than "deal with the issues" with Cook because Defendant believed that Cook was "more valuable to the company" than Plaintiff.  (*Id.* at 7.)  Plaintiff further suggests that the reason for Cook's animus against him was not his age but was the fact that Plaintiff spoke out against the changes.  (*Id.* at 6 ("I was used as an example of what would happen if you spoke.").)  Thus, it appears that Plaintiff is contending that even if his termination was motivated in part by Plaintiff's age, it was also motivated in part by other, nondiscriminatory factors.  Again, the ADEA does not authorize a mixed-motives age discrimination claim, so even if Plaintiff had shown that age was a motivating factor in the decision to terminate

15

him—which he has not—he still could not show that he was terminated *because of* his age. *Gross*, 129 S. Ct. at 2350.

CONCLUSION

As discussed above, Plaintiff has not shown that there is a genuine issue of material fact that he was terminated *because of* his age.  Accordingly, Defendant's Motion for Summary Judgment (Doc. 29) is granted.


IT IS SO ORDERED, this 4th day of March, 2010.


S/Clay D. Land
                 CLAY D. LAND
        UNITED STATES DISTRICT JUDGE

16